Thank you very much, Your Honors. May it please the Court, my name is Lanny Tron. I represent Appellant John Wood. I respectfully request five minutes of my allotted time for rebuttal, Your Honors. All right. Watch the clock. Okay. Your Honors, in this case, it is Appellant's contention that summary judgment was erroneously granted, in part because the Court weighed the evidence. The Court weighed the evidence and made determinations of the credibility of the evidence. It made determinations of credibility of witnesses. It determined the truth of the matter. It determined, as it sets out in its statement of, quote, unquote, uncontroverted facts, that there's a dispute over comments made by supervisors. There's a dispute over the interpretation of a document. There's a dispute over whether certain acts were adverse employment actions or not. All of these were really province of the jury and not the judge. And if the Court truly found disputed issues a fact, then it should have denied the motion for summary judgment and permitted this employment discrimination, employment retaliation case to proceed to trial, where there could be a full airing of the evidence, a determination of the credibility of the witnesses, and the allegations of discrimination and retaliation could be determined by the jury, the proper party, the proper fact finder, for issues like this. The Court, the District Court, granted summary judgment on all the claims for relief. Of particular significance was the retaliation claim, where the Court held that there was no causal link or nexus between the protected activity and the adverse employment action. First, Your Honors, the adverse employment actions in this case, the Court limited only to termination. The Ninth Circuit has articulated a deterrence test. That is, an action is an adverse employment action if it deters an employee from engaging in a protected activity. In this case, John Wood, after he testified in his deposition, had his computer removed, had his office furniture minimalized, he was denied the right to attend educational seminars, he had no administrative support. Furthermore, after he testified at trial, he was removed from his loading cubicle, his desk phone was removed, his phone was taken away, and he was forced as a manager to shuttle around Southern California, when less than two years ago he had managed departments, he had managed people, he was responsible for a great many more job duties. Could you clarify one thing for me with respect to his testimony at the deposition and at the trial? Was he subpoenaed or did he do it voluntarily? It was a, he did it voluntarily as an employee of Dollar Rent-A-Car. In other words, he was asked by, was he asked by Dollar to appear at the deposition or was he asked by? He was asked by me. By the other? By the plaintiff's counsel. Yeah. I represented Polinsky and Bates in the eighth district case. And he just voluntarily agreed to do it. He volunteered with the consent of the counsel, correct. Right. And he appeared and testified. And his testimony assisted to the extent that a corroboration. Is there anything that shows that Dollar attempted to discourage him from testifying? The only evidence in the record, Your Honor, is at the deposition itself, Wood was pulled out of the deposition session and berated by his then-counsel, Dollar's then-counsel, for testifying truthfully about a diary he had kept as to the events which were the basis for Bates and Polinsky's age discrimination claims, comments about the meeting, the way he was being treated. So to the extent there is evidence in the record, that is there, Your Honor. The evidence of the defense counsel berating him? Yes. Was the defense counsel suggesting he shouldn't testify truthfully about the diary? I don't know exactly what transpired. All I know is that he was pulled out of the deposition session and berated for testifying that he had maintained a diary and had disclosed to plaintiff's counsel, which was me at that time, that he had this diary of those ages, comments, or events that had occurred which Dollar was disputing had occurred at all. All right. He did suffer these adverse employment actions for engaging in that protected activity. He eventually suffered the ultimate, that is, the termination. Now, the causal link between the events is shown not only by the temporal proximity. Between the time he testified at trial and the time he was terminated, it was only a short eight months. The time between his deposition testimony and these other events that I mentioned earlier, it's much shorter than that. It's months, less than six, Your Honor. And that does show some at least inference of a causal link. Then there is the fact that the decision-makers who made the decision to terminate Wood all knew about his engagement in the protected activity, that is, his testimony. In fact, just days before his termination, discussed it in meetings, knew that he testified in the Bates-Felinski trial, knew that he had said he would, he was, or had alleged that he was helpful to Bates and Felinski, and were aware of that at the time they made the determination. That can cause a reasonable inference, again, of a causal link between the protected activity and the adverse employment action.   I'll go back to the court in a moment. Yes. Go ahead, Judy. Well, Dollar argues that the firing was as a result of the poor economic situation after 9-11. That is true, Your Honor. And that is their legitimate nondiscriminatory reason. They were profitable for the year 2001. Those two facts alone, Your Honor, shed at least a reasonable inference that there is no financial distress. Moreover, the President of Dollar, in a statement, said he was satisfied with their performance in July and August of 2001. The President's president, a fellow named Joe Cappy, testified, or there is evidence in the record that he said they were right on track. Now you have two high-ranking management officials saying they're right on track. You have documentary evidence that they're profitable. That certainly doesn't seem like a financial distress or financial woe. Or at least it causes, it can cause a reasonable inference to a fact finder that maybe that's a contextual argument, that they're really in financial distress. And at least they should. Well, go ahead. Well, I just, and the timeline is that these other adverse employment actions that you talk about occurred before 9-11. Yes. Okay. Yes. Go ahead. I was just going to say, what about, there was this allegation or the documentation in the record that his particular layoff did not really fit within the protocol that they had for their layoffs scheme. Correct. Is that right? That is correct. Their layoff procedure, the written document they had for their layoff procedure, which was created 10 days after 9-11, set out for no layoffs of full-time employees. He was a full-time employee. He was a full-time employee. He'd been there for eight years, Your Honor. He had manager, managed people. So, yes, full-time employee. At a deposition a year after, a year after this layoff procedure memo, the author of it all of a sudden realized, boy, I made a mistake. It should have been I could layoff full-time employees. That issue alone, between the black and white layoff procedure, which does not provide for layoff full-time employees, as opposed to what the author said it should have said, is an issue that should at least be left for the jury to decide whether the credibility of this witness in the statement of his deposition, as opposed to a document he prepared, is one that sheds light on whether it's a pretext or not. In Woods' case, not only was there a problem with the document, there was a problem with the procedure itself. Woods gets added to the layoff list at the last minute. Three days before, he's added to the list. They have a list already. Frantically, a phone call comes from Woods' supervisor, get Wood on the list. Frantically, they put the list on and push it through human resources. The manager that puts him on the list acknowledged in his testimony he was not going to terminate managers. Wood was the only manager in the western region terminated in the latter part of 2001. And that it was Woods' supervisor that said he was part of the old regime, part of the old management. That was the supervisor that put him on the list. I think we understand your argument. And why don't you – you can take all of your time, but why don't you reserve it so that we can hear the other side and then you can respond. I thank you, Your Honor. Thank you. Good morning, Your Honors. Good morning. May it please the Court, my name is Michael Wyatt and with me at counsel table is Monica Quinn representing Dollar Rent-A-Car, the Apo Lee here. I'd first like to begin with the – what the district court judge began with, which is the breach of the implied contract claim. Can I just ask you something? I'll just tell you the thing – the issue that troubles me the most about this isn't really the merits. It's more what the district court judge did here, because there did seem to be many facts in dispute. And Judge Klosner, in his order, resolves these facts. And that's just contrary to the summary judgment standard. There certainly are some instances where he said there was a disputed testimony. And there were several cases where summary judgment was affirmed, which we cite in our papers, where the appeals court or the district court said the same thing. Joe said X, Y denied it, and they go on and grant summary judgment. That doesn't mean he resolved it. But they have to make – they have to make an additional statement. They have to say, but it's not material. This judge not only didn't say it's not material, it goes to the very heart of the issues that are presented in these claims. Well, I cited in a brief Rabinowitz where the plaintiff – the Court said something like this is an appeals court decision. The plaintiff contends that the manager told him to resign if he didn't like it, but the manager denies making such a statement. Similarly, in A.N., the plaintiff alleges such and such a statement, and the Court just said the other guy doesn't recall making that statement. If there's a dispute, and it's material, and you're going to go ahead and grant summary judgment, and you're going to still go ahead and try and rule on the thing, you have to construe that, take that dispute in the light favorable to the other. You have to assume the facts in favor of the nonmoving party. If there's a dispute. And that's what the judge didn't do here. Well, I don't know that there are any material facts in the dispute. Just because you say X said Y and Z denied it doesn't mean he's resolving that dispute either way. He's just saying here's what the paper showed. Well, as an example of what Judge Paez is saying, there's Evans in the record, there's this low economy after 9-11. But there's also evidence in the record that dollar had a huge profit. Maybe not as much as in the past year, but it still had a profit. So what we have to do is, in construing the facts in the light most favorable to the nonmoving party, is we have to say that the economy may have been slow, but it didn't hurt dollar. Dollar made a profit. First of all, Your Honor, I don't think there's any case in the history that I can think of where the financial condition of an industry was less in dispute than after 9-11. Congress passes those. I'm saying that's a true fact. That is a true fact, right? That the industry is in total disaster. Well, the U.S. economy suffered after 9-11. That's we can take judicial notice that that is a true fact. However, that's not what's being litigated here. What's being litigated here is whether or not the reason that Mr. Wood was laid off was because of dollar's specific financial circumstances. And wouldn't it be great? I mean, every employer could say, oh, 9-11, now I get to fire all these people and say it's because of the economy, you know, who are too old or, you know, they don't fit in because they're black or Hispanic. I mean, you have that as an excuse. But what you have to say is what are the facts here and how do we construe them on summary judgment? You take the simple fact that every single thing that dollar said it did was uncontested, that they laid off 20 percent of their folks at headquarters, that within two weeks they cut back on millions of dollars of capitalization, that they cut back the rabbi trust, they cut back merit raises, they put a hiring freeze. This wasn't just let's start getting rid of bodies. As a matter of fact, three of the testimonies undisputed, three other car rental agencies were in bankruptcy at this time, making $6 million in a quarter where you made $36 million last year is an 84 percent drop in profits. And some suggestion that because you made a profit, therefore, what you did you shouldn't have done is by definition contradictory. Because if they hadn't done everything they had done, they would not have made a $6 million profit. Nevertheless, 84 percent reduction. Because you're arguing facts. Well, undisputed facts. Facts are disputed. That's exactly right. I don't think there's any dispute they were in a financial disaster because Congress certified that the airline industry, they passed a law 11 days after 9-11 certifying, excuse me, that the financial industry, I'm sorry, that the airline industry was in a financial disaster. But the economic situation after 9-11, it's not undisputed that that's why Mr. Wood was fired. No. But whether there was a financial disaster, the argument is, hey, you made $6 million. Any time you make a profit, you must not have a reason. That's merely an argument. That's not a factual dispute. There's no dispute about the facts. The factual dispute is Mr. Wood says that wasn't the reason you laid him off. Understood. But then you transfer it to focus specifically on Mr. Wood. There were 200 employees laid off. The court, I mean, the lower court recognized without any dispute what the procedure was. The President constantly testified, and it's in writing, when we want to cut, we want to cut people who are not in face-to-face, undisputed about this. Mr. Wood wasn't involved in the decision. He doesn't dispute it. There's no evidence to dispute it. We want to cut back on people who don't deal with the public. There was repeated testimony about folks in the back of the house, administrative positions, not dealing with customers. Mr. Wood fit all of those categories. Yes, he was a manager. There were three managers laid off in Southern California in the same quarter. Part-time employees got laid off in a higher percentage than full-time employees. Managers also got laid off. He can say they shouldn't have picked me, but he's got to have a nexus that has to do with my age, because hundreds of people got laid off, including others in Los Angeles. Let me just take you to another example of what concerns me about the district court judge's order here. And for him to reach the judgment that he did, in his order he's talking about the age discrimination claim. And the judge says, Plaintiff now has the burden to show that Dollar's articulated explanation, Dollar gave its explanation of the downturn in the economy, is pretext for age discrimination. In reviewing plaintiff's arguments and supporting evidence, this court concludes as a matter of law that plaintiff fails to meet his burden. This is because plaintiff offers no reliable evidence. He's weighing the evidence. You don't do that on summary judgment. As the California Supreme Court said when it decided Guzman had a similar layoff case, it said you've got to at least assess the evidence. And the California Supreme Court said in the age discrimination case and the layoff claim, the evidence here was weak. Only by assessing the evidence are you able to determine. He's weighing the evidence, though. He says no reliable evidence. He can say that. If there's evidence in the record that shows the layoff was proper, the court should still affirm. And there's overwhelming evidence. I can't imagine a financial situation more disastrous. A clear series of other things. It's not like let's just get rid of the old people. It's we're coming back on 401K. There will be no merit bonuses, hiring freeze, et cetera, et cetera, et cetera. There's all kinds of factors here, unique circumstances with respect to Mr. Wood from his involvement in the prior proceedings, involving the two other cases, his deposition and his trial testimony, his removal, taking his computer away and moving his cubicle. There's a whole series of things that happened to him. And then, you know, there comes time for a layoff. Sure, there was a downturn in the economy. The travel industry was severely hit by 9-11, the events of 9-11. There was no question about that. But you take a look at the protocol for layoffs and, you know, that protocol doesn't Mr. Wood doesn't fit within that protocol. And at the last minute, he's added to it. All of this raises, you know, it should be enough for this fellow to get to trial. What more does he have to do? Let me explain. Direct statements? There were certainly none of those. But let me respond. We're not we're not we're letting you go because you're too old? Let me respond to this. You know, it's difficult. It takes it's difficult to get into people's minds. And you have to look at all these circumstances. There is no credibility dispute about the protocol, Your Honor. The guy who wrote it said when it got merged it was a typographical mistake. Nobody else said you're not supposed to lay off full-time employees. There's absolutely no credibility dispute about the protocol. It was not 11 days after 9-11 when it was when the company was in the industry, not just the United States economy. But car rental companies are reeling. Three are in bankruptcy. And the protocol didn't say no full-time employees. The guy who wrote it said that was a mistake. And everybody else who tested Mr. Wood never said that was a mistake. There's no credibility dispute about that. It's just not in that particular document written in a hurry. But of all the people who got laid off, there are massive instances of full-time employees being laid off, including eight on the same day he was. So some suggestion there's a credibility dispute. There isn't any. How many were laid off at the L.A. facility? On that day? Yeah. If you take L.A. proper, L.A.X. L.A.X. L.A.X. Let's start with L.A.X. L.A.X. was eight or nine. I don't recall, Your Honor. And one from the region, which was Mr. Wood out in Ontario. Eight full-time employees. Were there all eight full-time employees? All eight were full-time employees. And Mr. Wood was the ninth. Or it's nine and ten. I may be one off. But everybody laid off that day. Was he the only manager? He was the only manager that day. And there were three in Orange County when they shut down their office. The managers aren't immune. The test was set out by the President and in writing. We are going to get rid of folks who don't interface with the customer, who are backwood or administrative. And that's where he fit. And anybody else testified in that trial that was laid off? Mr. Tron was attorney of record. I don't know who testified. But there's certainly no evidence that anybody else who testified had any adverse consequences. And if we look at his testimony, it's all pure vanilla. He doesn't say anything in there that in any way, I mean, that's not a he can argue that it says that. But that's not a credible view. We'd agree it was protected activity, wouldn't you? Testifying is protected activity. Sure. But just because you go testify doesn't mean that you have in the future a get-out-of-jail-free card. No. For the rest of your career. You can be fired. You can be laid off. He was laid off. It doesn't mean because you testified. You can't be discriminated against because of testimony. But what he has to do on summary judgment is raise a genuine tribal issue of fact with respect to the causal link here.  And he hasn't. If he just says I testified and bad things happened to you. But there's other, he's pointing to other things, the temporal proximity, which was about eight months, I think. I can't remember exactly how much. One year from the deposition, eight months from the trial you're on. And the other little incidents that happened along the way. Why isn't, if you just take it all into context, it's difficult to see why it wasn't sufficient to raise a genuine tribal issue of fact. Here's why. First of all, the most powerful one is remoteness in time coupled with intervening factor. 9-11, this is not I'm trying to decide who's the most qualified candidate. This is an industry that's reeling. So for them, and all the other measures you took, it wasn't just let's get rid of old people. In that context, undisputed. The diary that they've referred to, that's not an evidence. There was no evidence of that. They had a new team come in. They were not happy. That's what new management does. It shakes things up. We're not embarrassed to say when we brought in the new management team, we made a lot of changes. And if we as managers decide to do certain things, whether we take away Joe's computer or move so and so here, that doesn't mean it's age discrimination. There's no suggestion anywhere that other people were treated favorably. We can move folks around. That's what the new management team did. And some suggestion that there's any direct evidence when you say old management and new management, when you say we need some new blood, we should be proud of that because that's what industry does. When it's unhappy, it sends in a new management team. They make changes. And if you don't like the fact that you don't have a computer anymore or you're unhappy that your desk isn't as nice as the prior desk, that's not enough. You can look at all of this stuff. Those were just sort of hints. You ought to leave. Is that what you're saying? No, I'm not saying that at all. You ought to leave. Take away your computer. Take away your desk. Move your computer. Take away your cubicle. Take away your office. I'm saying that happens. Get the hint, buddy. We don't like you. I'm saying that happens in every. Well, if we didn't like you, why would we give you in January of 2001 a highly effective performance appraisal? Because that's what happened. Maybe he was doing a good job, but the company got, people got mad for him testifying. There's no evidence of that at all. If all he could do, if you just testify, vanilla, bland testimony, he doesn't say anything. The testimony's in the record. There's nothing you can point to that says this was somehow devastating testimony. And, in fact, the desperation, it seems to me, is followed by Mr. Wood when he says because he testified, the case is settled. He doesn't, if you read his brief, he doesn't point to any evidence that said, and I said, boy, oh, boy, the way they treat old folks around here is horrible. Here's what happened to me. Here's what happened to them. There's none of that. And the reason he didn't point it out in the brief is because there isn't any of it. You can't just say I testified, bad things happened. That's age discrimination. There's no direct testimony, no direct evidence of discrimination. The fact that you say we want new blood, the fact that I gave blood when I was in college, I gave it in my 50s, and I intend to keep giving it, that's going to be new blood to whoever gets it, the old administration, the new administration. There's no direct evidence. It's clear that Dollar decided they had to do a lot. There's layoffs before Mr. Wood got laid off. If they were so keen on getting him, they would have laid him off earlier. The intervening factor, the remoteness in time, the following their own policy, no credibility dispute. He can say it wasn't on the list, this factor about full-time people. Everybody got laid off the same day he did. I'm sure there's no industry or employer I've ever worked with where there's a customary practice for people to keep diaries. My answer is I don't know. My experience says people do it if they want to. And he got diaries not in evidence. They were concerned that he was trying to set them up. Your Honor, that would be speculation on my part. But the diary's not in evidence. Well, I know it's not in evidence, but I'm just, you know. People, I mean, I sometimes keep a diary. I sometimes make notes. Whatever it was, we're not here to testify about it. And certainly the fact that he testified, there ought to be some showing there's got to be a nexus. Eight months, a year later, he gets laid off. What happened in between? Well, 9-11, the industry's reeling. We lay off lots of folks, and he fits the mold. There's no suggestion we didn't follow our own procedures. And on the weighing of the evidence, there's no credibility dispute about the material facts. Powerful reason. I don't know why the district court said plaintiff offers no reliable evidence. Well, I'm sorry. There's no evidence before. Because he said it doesn't mean you can't affirm it's ruined. No, I understand that. It's de novo on our part. So there seems to be some requirement that it's not enough just to say what he said was wrong, but more specifically, what material facts are we looking at here? I want to turn briefly to the leave-out questions, which we really haven't talked about. It doesn't matter whether or not he was on leave at the time. There's a claim here that he was somehow denied leave because he wanted to go, he wanted to take leave, but he was denied it improperly. The leave decision was clearly made, no material dispute, before he shows up. He gets a call from the manager who's driving out from LA, which is where the regional headquarters is, to meet with him. He knows it's not good news. He's heard there's going to be layoffs. He hasn't done anything in writing that morning. Before the guy gets there, he starts dialing frantically to prior manager friends of his, gets the name of the lawyer, calls the lawyer. Then and only then he calls somebody at the dollar. But there's no suggestion that the refusal to grant him leave had anything to do with that, because the leave decision, including the final paycheck, was there waiting when he gets in. Well, doesn't the leave claim and the CAFRA claim, don't they both depend on whether or not the termination was lawful? No. If the leave, if they've already made a decision to lay him off, you could, the only, the denial of that has nothing to, he can be laid off for bad reasons. But he's got to show he was discriminated against because he requested leave. He's got no disability discrimination claim on him. Let's say they fired him for the worst imaginable reasons. We hate you because whatever. He comes in and says, I want to go on leave. And they say, look, you've already been laid off. There's no discrimination because he came and asked for a leave. The decision gets made ahead of time. He's got to show some evidence that there was an interface, and the lower court got the standard wrong. But again, it doesn't matter because the standard is, was there interference with his request for leave? We say no. We already made the decision to lay you off. You're correct. He's not claiming here that he was fired or terminated because he asked for leave. That's not his claim. But we have, our case law seems to suggest in this kind of instance where, you know, he's claiming that his termination was improper or unlawful for some statutory violation. Here it's age and retaliation. That if that was improper, our case law seems to suggest that his denial of his leave act claim is tied to that, as Judge Wardlodge has suggested. If there's a public policy discrimination termination claim, but not just simple denial of it. We have a. I'm not sure I have to ask counsel this yet. I haven't done so yet, but I intend to. What he stands to gain under the circumstances of this case from his family leave act claim. Under either Federal or State law. There are cases where you can fire people when they're off on leave. That doesn't matter. Somebody was out on leave for being an alcoholic. They went through her desk. They found she hadn't taken care of all the bills. They decided to fire her. The law is quite clear in the cases we cited that only if your denial or the adverse action happens because you requested or wanted the leave. How can there be a bad act related to his request for leave when he had not made the leave request prior to the decision to lay him off? Prior to cutting the check. Prior to setting up the meeting. How can that be a denial of his request for leave when the decision was already made? All right, counsel. You are over your time. Thank you. Thank you. Thank you, Your Honors. In rebuttal, all that I offer is that this Court does have the noble review of the summary judgment. And as the Court has pointed out, discrimination cases are difficult. They're especially difficult when you don't have direct evidence. Appellant does argue that there is direct evidence. There are ageist comments from Sousa, his supervisor, ageist comments from Pax and the President, ageist comments. Well, there's something to be said for the fact that comments like, you know, we're going to get rid of the old regime. I mean, or the old management. That doesn't necessarily mean that getting rid of you, if you were part of that old regime, is that we're getting rid of you because of your age. That's correct. But you have to look at the case law seems to suggest that. You have to look at it in context, Your Honor. The old regime were the oldest managers at Dollar. The old regime, the old management, were the oldest people there. They were the ones over 40. The new ones coming in, Sousa is not 40 years old. I mean, he's younger than 40. They get rid of the 40-year-old and bring in the 38-year-old. In Wood's case, the comment is recent college graduate. Well, the recent college graduate is in her 20s. Wood's in his 50s. You have to put it in context. You've got to let the jury decide whether does old management mean the ones before us or does it mean the old guys, the guys we don't want around anymore because they're dead weight, or whatever discriminatory implication they want attached to that. If all you had were just those statements, you might have a hard case. I agree, but those are the statements that we had in the Bates-Volinsky matter, and those are the statements that led, as counsel put forth in their papers, to the settlement in the case. So, sure, if that was the only thing. But we don't. You've got to look at the circumstances surrounding it, the credibility of the witnesses, and those are all issues that we have in this case. When, as the court pointed out, Wood was put into such a tiny little box and continually squeezed, it could conceivably have led to a constructive discharge, but the guy hung in there until they finally let him go. I mean, a smaller office, no office. A computer, no computer. Huge job duties, no job duties. People to manage, nobody to manage. You know, those are all an issue which someone could certainly say that tied in with the direct evidence, the circumstantial evidence, wow, maybe you do have the discrimination here, and that's something we ought to take a look at. All that we ask as the appellant is for a reversal and a remand so we could have the full airing. Let me ask you this. Judge Wardlaw raised with you, with former, with your opposition counsel here, what do you get out of the family leave act claim under both State and Federal law, in the particular context of this case? In this case, his big concern was that he had an entitlement to this right, and at the time, he'd just come off his stroke.  They hadn't terminated him. You know, 9-11 happened, his termination happened two months later. They'd already gone through all sorts of layoffs. What extra damages do you get? Well, there are no extra damages, Your Honor. Somewhat duplicative in this particular case. I mean, you're not claiming here that they let him go because he made a family leave act. I am not. I'm saying they interfered with the right he had. He had, you can only, he had an entitlement to it. His termination was unlawful. Well, if the termination was unlawful with the family leave act, I guess this is the only thing I could see why that claim would remain. If his termination was unlawful, then he would have otherwise been entitled to the pay under the family leave act. Correct. Correct. I'm not going to mince words. There's no additional damages. I mean, there's the attorney's fees clause, which is part and parcel of that. I don't see any additional damages. But what we, what the appellant did with the family leave act was try to get that which he was entitled to. He didn't believe he had to. It's not going to get us anything extra looking at it, you know, in a dollars and cents sort of context, but sometimes we look beyond that. And that was our claim there. And again, all I ask. Just out of curiosity, did this case start out in superior court? It did not. Start out in federal court? Start out in federal court. So under the family leave act. Yeah. Family leave act gave us federal question jurisdiction on 1331, but the diversity of the parties gave us. Diversity of jurisdiction. Diversity of jurisdiction. And then that's it. I have nothing further. Thank you for your time, Your Honor. Thank you. Thank you.
judges: Hall, Wardlaw, Paez